**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**NORTHERN DIVISION**
**AT COVINGTON**

**CIVIL ACTION NO.: 2:18-cv-110 (WOB-CJS)**


**GRETCHEN SCHMIDT**                                    **PLAINTIFF**


**VS.**                      **MEMORANDUM OPINION AND ORDER**


**ST. ELIZABETH MED. CTR.**                            **DEFENDANT**


This is an employment discrimination case arising from Defendant St. Elizabeth Medical Center's termination of Plaintiff Gretchen Schmidt's employment.

Plaintiff alleges she was terminated based upon her alleged disability, in violation of the Americans with Disabilities Act ("ADA"); her age, in violation of the Age Discrimination in Employment Act ("ADEA"); and both disability and age, in violation of the Kentucky Civil Rights Act ("KCRA"). Plaintiff further alleges her termination constituted retaliation in violation of the ADA and Kentucky law, and interference and retaliation under the Employee Retirement Income Security Act ("ERISA"). (Doc. 9).

This matter is now before the Court on defendant's motion for summary judgment (Doc. 32). The Court previously heard oral argument on this motion and took the matter under submission. (Doc. 49).

Having given the matter further study, the Court now issues the following Memorandum Opinion and Order.

### *Factual and Procedural Background*

Plaintiff worked as a Registered Nurse at St. Elizabeth Hospital during two periods of time: 1988-1995 in Covington, Kentucky, and from 2005-2017 in Ft. Thomas, Kentucky.[1] (Schmidt Depo. Doc. 27 at 14-15).

At the times relevant here, plaintiff worked the "weekend option" – meaning that she worked two twelve-hour shifts each weekend but was paid for working thirty-six hours. (*Id.* at 16; Cornett Depo. at 27). Plaintiff worked on the floor called "Four South" which comprised medical/surgical and oncology patients. (*Id.* at 33-34).

### A. **Plaintiff's Medical Leaves**

Plaintiff experienced several health issues during her employment at St. Elizabeth for which she took leave, including Family and Medical Leave Act ("FMLA") leave and non-FMLA leave. These health issues included bunions on both feet, back pain, and migraines.

Medical leave at St. Elizabeth is handled by the hospital's Medical Leave Office, which is separate from the Human Resources Department and at a different physical location. (Cornett Depo.,

---

[1] Prior to 2008, plaintiff's employer was St. Luke Hospital, but that entity merged with St. Elizabeth, retaining the latter's name.

Doc. 52-1, at 85-88, 199).  Communications to employees regarding FMLA leave were sent through an "FMLA Mailbox" email address. (*See, e.g.,* Docs. 27-18, 27-19).

Plaintiff requested and was granted leave on numerous occasions, including June 9-July 2, 2010 (non-FMLA leave); November 4, 2013 (intermittent leave for two day a month beginning on that date); December 27, 2013-February 9, 2014 (FMLA leave); January 18-31, 2015 (non-FMLA); December 10-13, 2015 (FMLA leave); May 28-31, 2016 (FMLA); December 11-23, 2016 (non-FMLA); and February 8, 2017-May 2, 2017 (non-FMLA).

Plaintiff testified in her deposition that she never felt that anyone from St. Elizabeth "gave her a hard time" or retaliated against her for using medical leave until her termination in 2017. (Schmidt Depo. at 89-91). Plaintiff's 2017 medical leave will be discussed further below.

## B. **Plaintiff's Disciplinary History**

Plaintiff's employment record with defendant contains numerous disciplinary issues which defendant asserts form the backdrop to events in 2017 that cumulatively led to plaintiff's termination.

### 1. **2009-2016**

In August 2009, plaintiff was written up after a family of an elderly patient complained that plaintiff was rude to them.  (Doc. 27-4).  Specifically, the family reported that plaintiff said to

3

the family's personal care assistant, who accompanied them to the hospital: "I don't know how you work for this family, you have to either be a saint or on drugs." (*Id.*).

On October 9, 2009, plaintiff received a coaching session from her supervisor, Sandra McCormick ("McCormick"), based upon another family's complaint that plaintiff was rude to them. (Doc. 27-5). Plaintiff testified that she understood at that time that she needed to correct her behavior. (Schmidt Depo. at 38, 41-42).

On November 17, 2009, a doctor complained that plaintiff had called him and was "rude and aggressive" and hung up on him. (Doc. 27-6).

In early February 2010, a co-worker reported to McCormick that a patient had complained that plaintiff, who had been his nurse for two nights, was "very rude" and "short" with him and "spoke rudely" to a visitor of a patient across the hall. (Doc. 27-7).

On February 18, 2010, McCormick issued plaintiff a "Level II Counseling" for complaints regarding her rude behavior, which stated: "Gretchen, this type of behavior cannot and will not be tolerated." (Doc. 27-8). Plaintiff testified that she understood that she could face further discipline, including termination, if such behavior continued. (Schmidt Depo. at 48).

That November, a co-worker emailed McCormick to tell her that plaintiff had been "very rude" to another nurse on the shift

4

because the nurse refused to tell a family of a dying hospice patient to leave. (Doc. 27-9). The co-worker said that plaintiff slammed a clipboard on the desk, leaving the other nurse "very upset and shaky." (*Id.*).

In May 2011, a co-worker reported to McCormick that plaintiff yelled at an employee from the Emergency Department in front of a patient. (Doc. 27-12).

In August 2011, numerous complaints about plaintiff's rudeness towards patients led McCormick to recommend to the Nursing Director that plaintiff either be terminated or receive a Level 3 disciplinary warning with mandated counselling through the employee assistance program ("EAP"). (Doc. 27-15). Plaintiff received the Level 3 warning and was referred to the EAP to address her anger, mood swings, and "general rudeness." (Doc. 32-9; Schmidt Depo. at 80). Plaintiff testified that she was concerned she would lose her job if she continued such rude behavior. (Schmidt Depo. at 82).

On June 3, 2012, Cindy Dennis ("Dennis"), a St. Elizabeth Clinical Supervisor, emailed McCormick to report that she had been asked to speak with the wife of a patient. (Doc. 27-16). The wife told Dennis that plaintiff was "rude and unprofessional" and told the wife several times to "go home," although the wife wanted to stay because her husband had just had surgery. The wife requested that plaintiff not care for her husband again. (*Id.*).

In August 2013, a patient submitted a "Care Gram" – apparently a form intended to convey positive comments about staff – stating that plaintiff was "extremely rude," administered medications "forcefully enough that it hurt," and "her bedside manner stinks." (Doc. 27-17).

In July 2014, a patient reported that plaintiff was "very rude" and "did not want to do her job." (Doc. 27-20). Plaintiff testified that she knew at that time that she needed to be aware of patients' perceptions. (Schmidt Depo. at 94).

In September 2014, a patient sent a lengthy email complaint to St. Elizabeth administration titled "Crazy nurse coming into my room yelling outloud." (Doc. 27-21). The patient stated that he had tried to call his nurse aid, and that plaintiff came into his room "yelling and screaming;" that she was "totally unprofessional;" that she was "furious;" that he felt it was an assault by "this crazy raged nurse;" and that he was going to contact his lawyer. (*Id.*). Plaintiff's then-supervisor, Julie Maegley ("Maegley"), spoke to plaintiff about the incident, and plaintiff told Maegley she would "return to EAP to try to make improvements on this area." (Doc. 27-23 at 1).

In November 2014, Maegley met with plaintiff and a nursing assistant named Cheri regarding a conflict between them which had caused Cheri to request a transfer so she would not have to work with plaintiff. (Doc. 27-22).

6

On January 5, 2015, plaintiff received a Level I Counseling for "Job Performance; Attitude; and Patient Complaints."  (Doc. 27-23).[2]  This report recounts numerous complaints from staff and patients regarding plaintiff's offensive, rude, confrontational, negative, and intimidating behavior.  In particular, a patient who was obese complained that plaintiff said to her: "Did you ever think of asking your doctor to cut off your hips?"  (*Id.* at 1).  And another patient who had bruised arms complained that plaintiff said to her: "I assume those aren't track marks," which the patient felt was an insinuation that she was a drug addict.  The counseling warned that a failure to conform to defendant's standards for patient care could result in "more severe disciplinary action up to and including termination."  (*Id.* at 3).

In February 2016, plaintiff received another Level I Counseling for "Job Performance: Behavior Conduct." (Doc. 27-24).  Plaintiff's supervisor, Deborah Augsback ("Augsback")[3] noted that a patient's daughter complained that plaintiff "did not have caring approach and [was] very short when asked questions."  The patient's family expressed these concerns to another nurse, Sarah, with whom

---

[2] The variation in the levels of the counselings that plaintiff received is explained by the fact that, under defendant's "Counseling Action" policy, these disciplinary notices expired after 12 months. (Doc. 39-2; Cornett Depo. at 187-188).

[3] Augsback had just started as a Nurse Manager on Four South the previous month. (Augsback Depo., Doc. 29, at 8).

plaintiff then had a verbal altercation in front of other staff and patients. (*Id.* at 1). The warning recounted some of plaintiff's past discipline and stated: "Due to the lengthy history of job performance, patient dissatisfaction and behavior counseling, please know that we are taking this incident very seriously. This type of behavior and conduct will not be tolerated in the future." (*Id.*).

In late November 2016, Augsback reported to Brandi Cornett ("Cornett") in Human Resources that Augsback had received three patient complaints about plaintiff over the previous weekend. (Doc. 27-27). Augsback spoke to plaintiff about these complaints and prepared a written counseling, but she ultimately was unable to issue it to plaintiff because of scheduling issues. (Doc. 27-28; Augsback Depo. at 17-19).

### 2. <u>2017 – New Complaints and Plaintiff is Terminated</u>

New disciplinary problems involving plaintiff arose in early 2017.

On January 8, 2017, Augsback was made aware that a patient was very upset about how plaintiff had treated her. (Doc. 27-32; Augsback Depo. at 20-21). The patient, who had a history of heroin use, had been admitted to the hospital to treat cellulitis of her arm. Augsback contacted the patient, who told Augsback that when plaintiff made her report to the morning shift nurse, plaintiff repeatedly said to the patient "you did have your baby under a

8

bridge"; "you use heroin correct"; and "your baby is at Children's Hospital because of withdrawal." (*Id.* at 1). The patient told Augsback she did not think these statements were relevant to her care and she felt that plaintiff was talking down to her. The patient was so upset after this incident that she called her mother, who also worked at St. Elizabeth. Augsback also spoke to the mother, who confirmed that her daughter had called her crying. (*Id.*).

Augsback contacted the morning shift nurse, Taylor Armstrong ("Armstrong"), to ask her about this incident. Armstrong sent Augsback an email on January 11, stating in part:

> Gretchen began report on a women [*sic*] with cellulitis in her arm. Pt. has hx of IVDU and had recently delivered a baby 3 mo. prior. During report, Gretchen mentioned several times that the women [*sic*] gave birth under a bridge and continued to ask the pt. to confirm that this was true. While doing this, I felt that Gretchen was trying to make the pt. feel bad while repeating the known fact over and over again. Gretchen continued to say that the baby was in Cincinnati Children's Hospital due to withdrawal symptoms because the mother had used heroin during her pregnancy.

(Doc. 27-36; Armstrong Depo. at 10-11).

In the meantime, plaintiff worked her next shift of January 14-15, but she missed the following shift due to illness. (Doc. 27-33; Schmidt Depo. at 133). Plaintiff then called off the next shift, January 28-29, due to foot pain. (Doc. 27-34; Schmidt Depo. at 134-135).

9

On February 8, 2017, plaintiff was notified by the St. Elizabeth Medical Leave Office that her request for medical leave from February 8 to May 2, 2017 to undergo surgery for the bunions on her feet had been approved. (Doc. 27-35; Schmidt Depo. at 135). Thus, her last day at work prior to beginning this leave was January 15. (Schmidt Depo. at 126).

Because plaintiff was on leave, Augsback called her to discuss the January 8 incident. (Doc. 27-41 at 1). Plaintiff told Augsback that the patient "was homeless and had her baby under the bridge." (Doc. 27-32). Plaintiff also stated that the patient had mentioned getting a pass to visit her baby but later said that her mother was going to see the baby.  Plaintiff told Augsback this was what she had been referring to when asking the patient, "Is that not correct?" Augsback's notes of this conversation with plaintiff further state:

> When I asked if the patient stated anything to her, Gretchen did say the patient did not know why she was asking questions and "did mention what has this got to do with my care" while she was giving report.
>
> Gretchen then stated "she was a drug addict, if she doesn't get what she wants, it comes back to bite me". As long as their medicine is there, all is good. "All are alike." "If you don't do what they want they get upset." I think she was upset because I put the bed alarm on and it went off 2 times.  She was friendly when the bed alarm was off.
>
> I then ended the call and explained I would let her know if I had any other questions.

(Doc. 27-32 at 2).  Plaintiff testified that these notes accurately reflect her statements to Augsback. (Schmidt Depo. at 126-129).

On January 19, 2017, Augsback received an email from a Nurse Manager, Sarah Wood, stating that plaintiff had called her about a hospital policy and "spoke aggressively" to her.  (Doc. 27-37).

That same day, Augsback emailed Benita Utz ("Utz"), defendant's Vice-President of Nursing, expressing frustration with plaintiff's behavior and informing her that Augsback had been consulting with Cornett about disciplinary options with plaintiff. (Doc. 39-10).  Utz indicated agreement with Augsback's approach and told her to "document well." (*Id.*).

Cornett and Augsback decided to interview plaintiff's co-workers to further investigate the January 8 incident. On January 20, 2017, Cornett and Augsback met with Stephanie Dunaway, Emily Smith, Carolyn Zumwalt, Heather Clark, and Armstrong. (Doc. 32-20).  During these interviews, plaintiff's co-workers reported a variety of concerns, including that plaintiff would text them when they were not at work to ask about whether certain employees were working; that the atmosphere on the weekend shift was "tense"; and Armstrong reported that she was concerned that plaintiff over-medicated patients.  (*Id.*).

In particular, Armstrong stated that plaintiff had given pain medicine to a terminally ill patient who had consistently refused all pain medicine, that plaintiff interpreted a small "nod" as

11

permission to medicate him all night, and that plaintiff told Armstrong he "wouldn't know what he was getting." (*Id.* at 2).

Although plaintiff had been scheduled to have surgery on both of her feet on February 8, she decided to have surgery only on the right foot and defer the surgery on the left foot until a later time. (Schmidt Depo. at 182-183). She testified that she told Augsback she would need surgery on her left foot at a later date, and that in April or May, she spoke with someone in the Medical Leave Office about her need for surgery on her left foot and her back. (Schmidt Depo. at 182-183, 194). Plaintiff testified that she did not tell Augsback about her need for back surgery. (Schmidt Depo. at 184-185).

On January 22, 2017, Augsback sent plaintiff an email asking her to collect peer reviews for her annual evaluation. (Doc. 39-12).

Sometime after Augsback and Cornett met with staff on January 20, however, they met with Cornett's boss, Lisa Blank, about the patient and staff complaints about plaintiff. (Cornett Depo. at 134). Blank thought the information was "egregious and serious," and the possibility of termination was discussed. (*Id.* at 136-137). Augsback indicated that she believed termination was appropriate. Cornett also was "leaning" toward recommending termination, but she testified that she would not send a formal

recommendation until she had a chance to speak to the associate to get their side of the story. (*Id.* at 139-144).

On February 17, 2017, Augsback emailed Rhonda Eviston to update her on the nurse evaluations that Augsback was conducting and stated that plaintiff "is the one that will be immediately suspended when she returns and then terminated." (Doc. 39-18).

On May 1, 2017, the Medical Leave Office notified Augsback and Cornett that plaintiff had been released by her doctor to return to work on May 6, 2017, with the only restriction being that she be permitted to wear tennis shoes for 4-6 weeks. (Doc. 27-38; Schmidt Depo. at 53, 154). Augsback approved plaintiff's return to work and indicated she understood the need for plaintiff to wear tennis shoes.  (Doc. 32-30).[4]

Plaintiff testified that, at the time she was approved to return to work, she was able to perform her job functions. (Schmidt Depo. at 53, 56). She also testified that the only activities she could not perform were to "mow the grass up a hill" and "walk long distances." (Schmidt Depo. at 54-55).

Augsback and Cornett scheduled a meeting with plaintiff for May 4, 2017 to discuss the new concerns raised in January. However, plaintiff arrived with an attorney.  Augsback and Cornett advised plaintiff that they wished to meet only with her, so

---

[4] Plaintiff was actually returned to work effective May 5, 2017. (Doc. 32-30).

13

plaintiff left. (Doc. 27-39; Schmidt Depo. at 157). That evening, Cornett emailed plaintiff to set a meeting for the following morning, cautioning that if she did not attend, it would be considered a resignation. (Doc. 32-24).

Augsback, Cornett and plaintiff met on the morning of May 5, 2017 and discussed the January 8 incident with the IV drug user; the medication of the hospice patient; a complaint by a male patient regarding a phone call; plaintiff's "tracking" of a co-worker's use of leave; and plaintiff's aggressive questioning of the Nurse Manager about a scheduling policy. (Schmidt Depo. at 160-161; Doc. 27-41). Augsback and Cornett asked plaintiff if she had a response to these incidents, and she said yes, so she was given access to a room with a computer where she typed up notes of her position on these complaints. (*Id.*; Schmidt Depo. at 169).

In her notes, plaintiff admitted making the statements to the patient with history of drug use regarding having her baby under a bridge and her baby being in withdrawal, but she wrote that she made them to get a "direct answer" from the patient. (Doc. 27-41 at 1). As to the hospice patient, plaintiff wrote that they had mutual friends and that she recalled him "nodding" and saying "okay" when asked about receiving pain medication. (*Id.* at 2). Plaintiff addressed some of the other issues raised, including a page and a half complaining about another nurse's use of FMLA leave

and the reasons that plaintiff kept notes of that nurse's schedule. (*Id.* at 3-4).

On May 8, 2017, Cornett sent an email to the St. Elizabeth Leadership Team recommending that plaintiff's employment be terminated based upon the January incidents and plaintiff's disciplinary history. (Doc. 39-5 at 3-4; Cornett Depo. at 62-63, 79-80). That committee's members were Rhonda Eviston, Benita Utz, Marty Oscadal, Lisa Blank, Peggy Essert and Vera Hall. (Cornett Depo. at 33). This executive team makes the final decision as to whether to accept a termination recommendation made by Human Resources. (Cornett Depo. at 40, 153-154; Augsback Depo. at 36).

Utz emailed Augsback that she supported the recommendation; that they "should have made this happen a long time ago"; that plaintiff was "crafty and always had an answer"; and that "from a patient perspective you did the right thing [and] in the end [that's] all that matters." (Doc. 39-26).

Committee member Oscadal responded to Cornett's email asking if plaintiff had any active discipline, and Cornett responded that she did not, as her most recent Level 1 counseling had expired while she was on leave. (Doc. 39-27). Oscadal replied that he had difficulty agreeing to a termination where there was no active counseling, and he asked for more information regarding the recommendation. (Doc. 39-28).

In response, Cornett emailed Oscadal details of the January incidents regarding the patient with the history of heroin use and the hospice patient to whom plaintiff provided pain medications. (Doc. 39-29).  Oscadal asked additional follow up questions, and Cornett, with input from Augsback, provided further information to Cornett's boss, Lisa Blank, who answered Oscadal's questions. (Docs. 39-5, 39-30).  Oscadal then agreed to the recommendation. (Doc. 39-31).

Other than providing information in response to Oscadal's questions, Augsback did not discuss the recommendation to terminate plaintiff's employment with any member of the Leadership Team.  (Augsback Depo. at 37-38).

Augsback and Cornett met with plaintiff on May 18, 2017 and informed her of her termination. (Doc. 32-27). Plaintiff refused to sign the termination letter.  At that time, plaintiff was 66 years old.

After plaintiff's termination, Carolyn Zumwalt, another nurse on Four South, assumed plaintiff's duties as well as additional leadership responsibilities. (Augsback Depo. at 55-59). Zumwalt was then 26 years old. (Zumwalt Depo., Doc. 31, at 6-7).

### 3. Plaintiff's Subsequent Employment, Activities, and Surgery

After leaving St. Elizabeth, plaintiff worked as a Registered Nurse for several employers. (Schmidt Depo. at 185-192). In 2018,

16

plaintiff began taking online classes at Northern Kentucky University to obtain her BS while employed as a Registered Nurse at Villa Springs, a long-term nursing and rehab facility. (Schmidt Depo. at 18, 150-151, 186).

In December 2018, plaintiff had surgery on her back. (Schmidt Depo. at 51).

Plaintiff testified that she remained employed at Villa Springs at the time of her deposition on June 5, 2019, and that she was in good standing and able to complete her job tasks. (Schmidt Depo. at 192).

### *Analysis*

#### A. **Analytical Framework**

The parties agree that plaintiff's claims are subject to the familiar burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792-802-04 (1973).

Thus, "(1) plaintiff must establish a prima facie case of discrimination; then (2) the burden of production shifts to the defendant to show a legitimate, nondiscriminatory reason for the way it treated the plaintiff; and (3) if the defendant does so, the burden of production shifts back to the plaintiff to show that the defendant's articulated reason was pretext for the adverse employment action." *Brown v. Kelsey-Hayes Co.*, 814 F. App'x 72, 80 (6th Cir. 2020) (citation omitted).

A plaintiff can establish pretext by showing that the proffered reason: (1) had no basis in fact; (2) did not actually motivate the adverse employment action; or (3) was insufficient to warrant the adverse employment action. *Id.* "Ultimately the plaintiff must produce 'sufficient evidence from which a jury could reasonably reject [the employer's] explanation of why it fired . . . her.'" *Id.* (citing *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 n.4 (6th Cir. 2009)). Plaintiff "must meet this burden by a preponderance of the evidence." *Id.*

**A. Disability Discrimination**

"To state a prima facie case of disability discrimination, a plaintiff must show that (1) he is disabled, (2) he is otherwise qualified to perform the essential functions of a position, with or without accommodation, and (3) he suffered an adverse employment action because of his disability." *Demyanovich v. Cadon Plating & Coatings, L.L.C.*, 747 F.3d 419, 433 (6th Cir. 2014) (citation omitted).[5]

A plaintiff can prove a qualifying disability "by demonstrating that she (1) is 'actually disabled,' meaning the individual possesses 'a physical or mental impairment that substantially limits one or more major life activities of such

---

[5] The language of the Kentucky Civil Rights Act "parallels that of the ADA and Kentucky courts interpret the KCRA consistently with the federal statute." *Banks v. Bosch Rexroth Corp.*, 610 F. App'x 519, 526 (6th Cir. 2015) (citation omitted).

individual'; (2) had 'a record of such an impairment'; or, (3) is 'regarded as having such an impairment.'" *Harrison v. Soave Enters. L.L.C.*, No. 19-1176, 2020 WL 5424040, at *4 (6th Cir. Sept. 10, 2020) (quoting 42 U.S.C. § 12102(1), (3)). Here, plaintiff is proceeding under the first prong, *i.e.*, she argues that she is actually disabled. *See* Doc. 39 at 23-25.

Plaintiff asserts that she was disabled because the medical problems with her feet "substantially limited her ability to perform manual tasks, walk, stand, and work, all of which are major life activities." (Doc. 39 at 25).

Under the ADA Amendments Act of 2008 (ADAAA), the term "substantially limits" is to be construed broadly and is not meant to be a "demanding" standard. *Harrison*, 2020 WL 5424040, at *5. However, the fact that Congress lowered this hurdle "does not mean that the hurdle is nonexistent." *Hentze v. CSX Transp., Inc.*, -- F.Supp.3d --, Case No. 1:17-cv-217, 2020 WL 4569127, at *10 (S.D. Ohio Aug. 7, 2020). *See also* 29 C.F.R. § 1630.2(j)(1)(ii) ("[N]ot every impairment will constitute a disability within the meaning of this section.").

Further, the Sixth Circuit has instructed that, even after the ADAAA, "a plaintiff who asserts that her impairment substantially limits the major life activity of 'working' is still required to show that her impairment limits her ability to 'perform a class of jobs or broad range of jobs.'" *Tinsley v. Caterpillar*

*Fin. Servs., Corp.*, 766 F. App'x 337, 342 (6th Cir. 2019) (citation omitted).

The Court has thoroughly reviewed the entire record in this matter and concludes that it does not support plaintiff's assertion that she was disabled at the time defendant terminated her employment.

Plaintiff testified unequivocally in her deposition that, at the time she was released to work following the surgery on her right foot in May 2017, she was able to perform her job functions at St. Elizabeth and that the only activities she could not perform were "mowing grass up a hill" and "walking long distances." (Schmidt Depo. at 53-56).

The record is also undisputed that the only restriction plaintiff's physician placed on her at that time was that she needed to wear tennis shoes, and even that was temporary — 4 to 6 weeks. Indeed, the record reflects that just three weeks after her termination, plaintiff reported to her surgeon that she had "walked 4 miles yesterday without pain." (Doc. 39-32; Schmidt Depo. at 56).

Finally, plaintiff testified in her deposition that, after leaving St. Elizabeth, she continued to work as a Registered Nurse for several employers, including the nursing facility where she was employed at the time of her deposition. (Schmidt Depo. at 192).

And, she testified she was able to satisfactorily complete her job duties in that position.

Perhaps recognizing the import of this testimony, plaintiff proffers a post-deposition affidavit. (Doc. 38-38). In this affidavit, signed by plaintiff on January 3, 2020 — seven months after her deposition and two months after defendant filed its motion for summary judgment — she describes limitations on activities such as shopping and walking due to her foot problems that she did not mention in her deposition.

There are two problems with this testimony as it relates to plaintiff's ADA claim. First, plaintiff states that she experienced these limitations between 2010 and her surgery on February 8, 2017. (Schmidt Aff., Doc. 39-38, ¶¶ 4-8). However, the relevant question on plaintiff's ADA claim is whether she was a disabled individual when she was fired. And, as noted above, her testimony was unconditional that as of May 2017 when she was released to return to work, she was fully capable of performing her job duties with only the temporary accommodation of wearing tennis shoes. The affidavit thus does not create a genuine dispute of fact on that issue.

Second, "a party opposing summary judgment with an affidavit that contradicts her earlier deposition must explain why she disagrees with herself." *Powell-Pickett v. A.K. Steel Corp.*, 549 F. App'x 347, 352 (6th Cir. 2013). That is, a party may not create

a triable issue by proffering an affidavit that contradicts her prior testimony.   To the extent that plaintiff proffers this affidavit with that objective, her effort must be rejected.

Finally, the affidavit also attempts to raise a dispute of fact as to plaintiff's alleged back pain. (Schmidt Aff. ¶¶ 18-25). Again, however, the limitations plaintiff describes in her affidavit predate her May 2017 return to work, and to the extent that she implies that they impacted her ability to perform her job at that time, such testimony also impermissibly contradicts her sworn deposition testimony.

Indeed, prior to February 7, 2017, plaintiff had never even asked for leave due to her back condition. (Schmidt Depo. at 182). It is not disputed that plaintiff underwent surgery on her back in December 2018 (Schmidt Depo. at 51) — a year and a half *after* she left St. Elizabeth.   The limitations she described in her deposition related to that surgery, (Schmidt Depo. at 58-59), are thus irrelevant to her claim that she was disabled in May 2017.

Therefore, the Court concludes as a matter of law that plaintiff cannot show that she was a "disabled" individual as required to state a prima facie case of disability discrimination.[6]

---

[6] Plaintiff also asserts a failure to accommodate claim.   She testified that this claim is based solely on the fact that she intended to take leave later in 2017 for surgery on her left foot and on her back. (Schmidt Depo. at 155-156).   In essence, however, this claim never really ripened because plaintiff's employment was terminated upon her return from leave. Plaintiff's treatment of

And, as discussed below, even if plaintiff could satisfy a prima facie case of disability discrimination[7], her claim still fails as a matter of law because she has failed to demonstrate that a reasonable jury could find that defendant's reasons for terminating her employment were a pretext for discrimination.

### B. Age Discrimination

To establish a prima facie case of age discrimination under the ADEA, a plaintiff must show that (1) she was at least 40 years old at the time of the alleged discrimination; (2) she was subjected to an adverse employment action; (3) she was otherwise qualified for the position; and (4) she was replaced by a younger worker." *George v. Youngstown State Univ.*, 966 F.3d 446, 464 (6th Cir. 2020) (citations omitted).

The parties spend much time debating the fourth element of this test, *i.e.*, whether plaintiff was "replaced" by Carolyn

---

this issue in her brief is cursory, at best, and she cites no authority for the proposition that an employer must retain an employee whom it otherwise has decided to terminate for non-discriminatory reasons in order to allow for future accommodations. (Doc. 39 at 27).

[7] The Court rejects defendant's assertion that plaintiff cannot show that she was "qualified" for purposes of the prima facie case because of her disciplinary problems. "[W]hen assessing whether a plaintiff has met her employer's legitimate expectations at the *prima facie* stage of a termination case, a court must examine plaintiff's evidence independent of the nondiscriminatory reason 'produced' by the defense as its reason for terminating plaintiff." *Stewart v. Steward Trumbull Mem. Hosp., Inc.*, 395 F. Supp.3d 907, 914 (N.D. Ohio 2019) (quoting *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 660-61 (6th Cir. 2000)).

Zumwalt, the substantially younger nurse alleged to have assumed her duties.

However, in the interest of efficiency, the Court will assume for purposes of summary judgment that plaintiff could establish a prima facie case of age discrimination.

## C. **ADA/KCRA Retaliation**

To establish a prima facie case of retaliation, a plaintiff must show that (1) she engaged in activity protected under the ADA; (2) the employer knew of the activity; (3) the employer took an adverse action against plaintiff; and (4) there was a causal connection between the protected activity and the adverse action. *Morrissey v. Laurel Health Care Co.*, 946 F.3d 292, 304 (6th Cir. 2019) (citation omitted). Claims of retaliation under the ADA are also subject to analysis under the *McDonnell Douglas* framework. *Id.*

Plaintiff testified that the only time she felt that she was retaliated against was when she was fired. (Schmidt Depo. at 91) She testified that in January 2017, persons in the Medical Leave Office she spoke to regarding her need for leave were "dismissive" and "curt." (*Id.* at 175-176). She identified these persons as either "Cheryl" or "Amy," but was not sure. Plaintiff also testified that she told Augsback that she would need surgery on her left foot at a later date. (Schmidt Depo. at 182-183).

As with plaintiff's age discrimination claim, the Court will assume that plaintiff can establish a prima facie case of retaliation and proceed to the issue of pretext.

**D. <u>Pretext</u>**

Defendant has articulated a legitimate, non-discriminatory reason for terminating plaintiff's employment: her lengthy history of discipline coupled with the incidents in January 2017. (Cornett Depo. at 62-63, 79-80, 157, 190; Augsback Depo. at 34-36). Plaintiff now must demonstrate that a reasonable jury could find that these reasons are a pretext for discrimination or retaliation.

As noted above, a plaintiff can establish pretext by showing that the proffered reason: (1) had no basis in fact; (2) did not actually motivate the adverse employment action; or (3) was insufficient to warrant the adverse employment action. *Brown v. Kelsey-Hayes Co.*, 814 F. App'x 72, 80 (6th Cir. 2020). "Whichever method the plaintiff employs, he always bears the burden of producing sufficient evidence from which the jury could reasonably reject [the defendant's] explanation and infer that the defendant [] intentionally discriminated against him." *Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F3d 274, 285 (6th Cir. 2012) (citation omitted).

When assessing the evidence, the Court is to keep in mind that pretext "is a commonsense inquiry: did the employer fire the employee for the stated reason or not?" *Parkhurst v. American*

*Healthways Servs., LLC*, 700 F. App'x 445, 449 (6th Cir. 2017) (citation omitted).

Plaintiff first argues that some of the reasons that defendant offered for firing plaintiff had no basis in fact. Plaintiff cites a mistake in the disciplinary history that Cornett included in her email to the Executive Leadership Team, *i.e.*, that plaintiff did not in fact receive a written counselling in December 2016. This is a red herring.  What the record reflects is that Augsback received three patient complaints about plaintiff in November 2016; she spoke to plaintiff about them and prepared a written counselling; but Augsback was ultimately unable to issue the written counseling due to scheduling problems. Notably, plaintiff does not deny that Augsback received those complaints.

Moreover, the December 2016 complaints were but a few of literally dozens documented in plaintiff's history over years, and defendant has consistently stated that it was plaintiff's cumulative disciplinary history, coupled with the January 2017 incidents, which formed the basis for plaintiff's termination. Plaintiff's assertion that defendant's reasons have been "contradictory" or have "shifted" simply finds no support in the record.

Next, plaintiff attacks the factual basis for the January 2017 incidents. As to the hospice patient, plaintiff contends that Cornett incorrectly stated that plaintiff admitted she did not

have "clear consent" to medicate him. (Doc. 39 at 30). Yet, plaintiff's own notes that she prepared when interviewed by Cornett and Augsback on May 5, 2017 state: "It was said to me by [Cornett] 'that a grunt and nod . . .' *I am not clear but maybe this was what was said to have been perceived as his saying yes.* But *I seem to remember he had said 'okay'* and nodded when asked each time." (Doc. 27-41). Cornett's characterization of this explanation as an admission that the patient's consent was not clear cannot be said to have no basis in fact.[8]

The same is true of plaintiff's argument regarding the account of her treatment of the patient with a history of drug abuse. Her discussion with Augsback in January and her notes made during the May 5 interview convey, in so many words, that plaintiff did, in fact, confront the patient with having had a baby under a bridge while homeless, and that the baby was in hospital with possible drug withdrawal symptoms. (Doc. 27-32, Doc. 27-41). Plaintiff's hair-splitting as to the exact words used raises no genuine dispute on this matter.

Moreover, plaintiff does not contest that this patient (to whom plaintiff referred in her deposition as "the little drug

---

[8] In addition, plaintiff's statement in her brief that "Taylor Armstrong denies ever reporting the incident with the hospice patient" is disingenuous. Armstrong simply testified that she did not recall the incident at all. (Armstrong Depo. at 17-18).

addict," Schmidt Depo. at 128) was so upset that she called her mother and later reported the matter to the hospital.

While plaintiff disagrees with the conclusions that defendant drew from these and many other incidents, she has not shown that defendant did not honestly belief that plaintiff engaged in multiple incidents of conduct which it determined to be extremely serious. *See Smith v. Towne Properties Asset Mgmt. Co., Inc.*, 803 F. App'x 849, 852 (6th Cir. 2020).

Under the "honest belief" defense, an employer may establish reasonable reliance on particularized facts before it at the time the decision was reached, even if they turn out to be factually mistaken. *Id.* Further, the Court does not "require that the decisional process used by the employer be optimal or that it left no stone unturned." *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 708 (6th Cir. 2012) (citation omitted). "Rather, the key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action." *Id.*

This makes sense. "[T]he focus of a discrimination suit is on the intent of the employer. If the employer honestly, albeit mistakenly believes in the non-discriminatory reason it relied upon in making its employment decision, then the employer lacks the necessary discriminatory intent." *Smith v. Chrysler Corp.*, 15 F.3d 799, 806 (6th Cir. 1998).

Defendant conducted investigations into the two serious incidents in January, as well as others. It got plaintiff's side of the story; it interviewed both patients and co-workers; and it reviewed relevant documentation. It was with all of this information before it that defendant concluded that plaintiff's employment should be terminated. Defendant thus made its decision based on "particularized facts" before it, and plaintiff does not proffer any evidence that defendant did not sincerely believe in its reason for that decision.

Plaintiff raises a few additional arguments. First, that contradictory statements were made about when the decision to fire plaintiff was made. This, too, is a red herring. The record is not disputed that the decision to terminate a nursing associate could only be made by the St. Elizabeth Leadership Team. It is also undisputed, as Cornett testified, that following their investigation into the January incidents, she and Augsback met with Lisa Blank, Cornett's boss in Human Resources. (Cornett Depo. at 134). At that time, Augsback had formed the firm opinion that she thought plaintiff should be fired, and Cornett and Blank were "leaning" in that direction. But Cornett further testified that she would not make a recommendation to the committee until she had a chance to speak with the associate to their side of the story. (Cornett Depo. at 139-144). And that is exactly what happened here.

Augsback's email to Eviston of February 17, 2017, stating that plaintiff would be "immediately suspended when she returns and then terminated" thus raises no genuine issue of fact.  That is clearly what Augsback believed should and would happen, but she had no authority to make that decision. And plaintiff has no proffered no evidence that any steps were taken to communicate a recommendation to the Leadership team until after Cornett and Augsback interviewed her on May 5.

The remaining miscellaneous arguments plaintiff makes (timing, "undocumented conversations," the tally of her medical leave which, it undisputed was not performed by anyone in the decision making process) provide no factual basis from which one could reasonable infer that disability, age, or retaliatory animus played any role in defendant's termination decision.[9] And mere "conjecture that the employer's explanation is a pretext for intentional discrimination is an insufficient basis for denial of

---

[9] And as to age, or course, the Supreme Court has held that the ADEA requires a plaintiff to prove "but for" causation. *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177 (2009).

Plaintiff filed supplemental authority drawing the Court's attention to *Bostock v. Clayton Cnty., Ga*, 140 S. Ct. 1731 (2020), for the proposition that the causation requirement on her disability claim might be less demanding than the "but for" standard. (Doc. 50). The Court concludes, however, that plaintiff has not raised a triable issue that her disability was even a "motivating" factor in her termination.

summary judgment." *Lindsay v. Yates*, 578 F.3d 407, 421 (6th Cir. 2009) (citation omitted).

In sum, plaintiff has failed to show that defendant's reasons for terminating her employment — no matter how vehemently she disagrees with them — were a pretext for any form of discrimination or retaliation.

### E. **ERISA Interference and Retaliation**

Plaintiff devotes but a footnote in her opposition brief to her claim that defendant terminated her employment as retaliation for her use of medical benefits or with the intent to interfere with such future use. (Doc. 39 at 34 n.2).

The Court finds that this claim likewise merits little discussion. Plaintiff points to no evidence of such motivation on defendant's part, and plaintiff herself testified that she experienced no such retaliation during her almost-twenty years of employment during which time she took multiple medical leaves.

And for the reasons stated above, the Court concludes that plaintiff has not raised a triable issue as to her claims that defendant acted with any unlawful motive in terminating her employment in 2017.

Therefore, having carefully reviewed the record herein, and the Court being advised,

**IT IS ORDERED** that defendant's motion for summary judgment (Doc. 32) be, and is hereby, **GRANTED.**  A separate judgment shall enter concurrently herewith.

This 4th day of November 2020.



Signed By:

**_William O. Bertelsman_**   WOB

**United States District Judge**